**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ANNETTE M. CLAIBORNE** | **CIVIL ACTION** |
| **VERSUS** | **NO:  13-0378** |
| **SOCIAL SECURITY ADMINISTRATION** | **SECTION: "R"** |

## REPORT AND RECOMMENDATION

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner") pursuant to Title 42 U.S.C. § 405(g). The Commissioner denied Plaintiff, Annette M. Claiborne's, ("Claiborne"), request for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423 and for Supplemental Security Income Benefits ("SSI") pursuant to Title XVI, 42 U.S.C. § 423.[1]

The matter was referred to the undersigned pursuant to Title 28 U.S.C. § 636(b), for the submission of Proposed Findings and Recommendations. On May 22, 2014, Claiborne filed a **Motion for Ruling (R. Doc. 20)**. Shortly thereafter, on July 18, 2014, Claiborne filed a **Motion to Supplement Complaint (R. Doc. 22).** Both of these motions will be incorporated into this Report and Recommendation.[2]

---

[1]Rec. Doc. No. 1, p.1.

[2]Rec. Doc. No. 20 & 22.

## I.    Background

Claiborne is a fifty-one-year-old,[3] 235 pound, 5' 6" female,[4] with one year of college education,[5] who has past relevant work as dietary assistant.[6] She also has past experience working as a security guard, circulation clerk, administrative clerk, hospital ward clerk, door-to-door census taker and teacher's aid.[7]

Claiborne filed for a period of disability and DIB under Title II, and protectively filed for supplemental security income ("SSI") under Title XVI of the Social Security Act, on December 17, 2009.[8] All claims were initially denied on April 6, 2010.[9]

She alleges that she became disabled on July 1, 2009 due to severe back pain, anxiety and hypertension.[10] She alleges she has not been involved in any substantial gainful activity after July 1, 2009 due to her condition.[11] Her date last insured is December 31, 2012.[12]

Claiborne filed a written request for hearing on April 12, 2010.[13] Christopher Juge, the

---

[3]Rec. Doc. No. 11-6, Tr. 135.

[4]*Id.* at Tr. 139.

[5]*Id.* at Tr. 140.

[6]*Id.* at Tr. 151.

[7]*Id.*

[8]Rec. No. 11-2, Tr. 20.

[9]*Id.*

[10]Rec. Doc. No. 11-6, Tr. 139.

[11]*Id.*

[12]*Id.* at Tr. 176.

[13]Rec. Doc. 11-2, Tr. 20.

Administrative Law Judge ("ALJ") held a hearing on September 28, 2010.[14] The ALJ denied

Claiborne's claims on October 18, 2010, finding that she was not disabled under the meaning of the

Social Security Act, ("SSA") from July 1, 2009 through October 18, 2010.[15]

In his decision, the ALJ analyzed Claiborne's claims pursuant to the five-step[16] evaluation

process used to determine whether a claimant is "disabled." Using this process, the ALJ found that

Claiborne met the insured status requirements of the SSA through December 31, 2012, that she did

not engage in substantial gainful activity since July 1, 2009, her alleged onset date.[17] The ALJ

further found that she suffered from "hypertension" and "obesity" as severe impairments.[18] Although

Claiborne alleges anxiety, the ALJ found that it did not rise to the level of severe impairment and

that Claiborne did not have an impairment, or combination thereof, which medically equaled the

impairments listed in 20 C.F.R. Part. 404, so as to constitute a presumptive disability.[19]

The ALJ also found that her medically determinable impairments could be reasonably

expected to cause the alleged symptoms, however, her statements concerning the intensity,

---

[14]*Id.*

[15]*Id.* at 28.

[16]To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. *Carey v. Apfel*, 230 F.3d 131, 134-35 (5th Cir. 2000); citing *Crowley v. Apfel*, 197 F.3d 194 (5th Cir. 1999).
      First, the claimant must not be presently working at any substantial gainful activity. Id. Second, the claimant must have an impairment or combination of impairments that are severe. Id. An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Id., citing Crowley, 197 F.3d 194, 197-98. Third, the claimant's impairment must meet or equal an impairment listed in the appendix to the regulations. Id. Fourth, the impairment must prevent the claimant from returning to his past relevant work. Fifth, the impairment must prevent the claimant from doing any relevant work that exists in the national economy, considering the claimant's residual functional capacity, age, education, and past work experience. *Id. See Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).

[17]Rec. Doc. No. 11-2, Tr. 22.

[18]*Id.*

[19]*Id.* at 23.

persistence and limiting effects are not credible to the extent that they are inconsistent with the residual functional capacity assessment.[20] The ALJ found that, between 2006 and 2009, Claiborne was diagnosed with hypertension, obesity, lower back pain and GERD[21] by Dr. Robert Albrecht, ("Dr. Albrecht") [22] The ALJ noted that Claiborne was gainfully employed from 2006 to July 2009, and is currently able to perform all household chores and care for her, at the time, 13-year-old twins and a four-year-old son.[23]

The ALJ also found that she was prescribed Clonodine for her hypertension, Prevacid for her GERD, and that she had recommendation to stay on a strict diet and to lose weight.[24] The ALJ also noted that between 2007 and 2009 Claiborne did not always comply with her medication regime for hypertension and concluded that any fluctuations in her blood pressure levels were a result of her non-adherence. The ALJ found that neither Dr. Albrecht nor the Family Medical Center assigned her any functional limitations.[25]

The ALJ found that there was no support for her allegations of foot numbness or blood pressure levels when Claiborne adhered to her medication regimen.[26] As such, the ALJ found that

---

[20]Rec. Doc. No. 11-2, Tr. 24.

[21]Gastroesophageal reflux disease (GERD) is a chronic digestive disease. GERD occurs when stomach acid or, occasionally, stomach content, flows back into the food pipe (esophagus). The backwash (reflux) irritates the lining of the esophagus and causes GERD. When these signs and symptoms occur at least twice each week or interfere with daily life, or when a doctor can see damage to the esophagus, one may be diagnosed with GERD. Most people can manage GERD with lifestyle changes and over-the-counter medications, but some people may need stronger medications, or even surgery, to reduce symptoms.
*Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/gerd/basics/definition/con-20025201*

[22]Rec. Doc. No. 11-2, Tr. 24-25.

[23]*Id.* at 25-26.

[24]*Id.* at 24-25.

[25]*Id.*

[26]*Id.* at 25-26.

she had the residual functional capacity ("RFC") to perform full range of medium work.[27]

The ALJ found that she is out of the work force for reasons unrelated to her medical or physical impairments, however, all limitations including obesity were accounted for in the assessed residual functional capacity.[28] The ALJ found that the assessment of work duty was consistent with medium work as defined by the Social Securities Act and Regulations.[29] The ALJ found that Claiborne is able to perform past relevant work such as a teacher's aid and security clerk.[30] Applying the Medical Vocational Rules the ALJ found that Claiborne was not "disabled" noting that she has a high school education, and is a younger individual.[31] The ALJ determined based on Claiborne's age, education, and work experience, there were jobs that existed in significant numbers in the national economy that she could perform.[32]

Claiborne sought timely review of the ALJ's decision with the Appeals Council on October 28, 2010.[33] She sought review because of an additional complication diabetes.[34] The Appeals Court denied Claiborne's Request for review on December 1, 2011.[35]

Thereafter, Claiborne filed the instant action in federal court, on March 1, 2013, seeking review of the ALJ's decision on the grounds that her need for finances were urgent and necessary

---

[27]*Id*. at 24.

[28]*Id.* at 26.

[29]Rec. Doc. No. 11-2, Tr. 26;

[30]*Id.*

[31]*Id.*

[32]*See* Rec. Doc. No. 11-2, Tr. 26-27.

[33]Rec. Doc. No. 11-2, Tr. 14-16.

[34]*Id.* at 7-14.

[35]*Id.* at 1.

to care for her children.[36]

Claiborne filed a **Motion for Ruling (R. Doc. 20)** on May 22, 2014, seeking this Court to render a ruling on her case. Because the findings in this report and recommendation successfully determine a disposition on Claiborne's case, the Court finds that Claiborne's motion should be denied as moot. Shortly thereafter, on July 18, 2014, Claiborne also filed a **Motion to Supplement Complaint (R. Doc. 22),** seeking to incorporate a report of Dr. Jodi McGee of River Parishes Hospital.[37] These records are dated July 15, 2014, and were not a part of the certified records considered by the ALJ. Therefore, the Court finds that these records are unnecessary in determining whether or not the ALJ erred in finding that Claiborne was not disabled in 2010. Thus, the Court finds that Claiborne's motion should be denied.

## II.   Standard of Review

The role of this Court on judicial review under Title 42 U.S.C. § 405(g) is limited to determining whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner applied the proper legal standards when evaluating the evidence. *See Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).  The Court may not re-weigh the evidence, try issues *de novo*, or substitute its judgment for that of the Commissioner. *Allen v. Schweiker*, 642 F.2d 799, 800 (5th Cir. 1981).  If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed. *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989). However, an ALJ's failure to apply the correct legal test constitutes a ground for reversal. Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991).

---

[36]Rec. Doc. No. 12, p. 1.

[37]*See* Rec. Doc. No. 22-2, p. 7.

6

Substantial evidence is more than a scintilla and less than a preponderance, and is considered relevant such that a reasonable mind might accept it as adequate to support a conclusion. *Ripley v. Chater,* 67 F.3d, 552, 555 (5th Cir. 1995); citing Richardson *v Perales*, 402 U.S. 389, 401 (1971). It must do more than create a suspicion of the existence of the fact to be established, but no "substantial evidence" will be found where there is only a "conspicuous absence of credible choices" or "contrary medical evidence." See Payne v. Weinberger, 480 F.2d 1006, 1007 (5th Cir. 1973); Hemphill v. Weinberger, 483 F.2d 1137, 1138 (5th Cir. 1973). However, a single piece of evidence will not satisfy the substantiality test if the ALJ ignores, or fails to resolve, a conflict created by countervailing evidence. Evidence is not substantial if it is overwhelmed by other evidence, particularly evidence offered by treating physicians. *Franklin v. Soc. Sec. Admin.*, No. 12-2681, 2013 WL 5739078, at *2 (E.D. La. Oct. 22, 2013); citing *Kent v. Schweiker,* 710 F.2d 110, 114 (3rd Cir. 1983).

The ALJ must give controlling weight to the opinion of a treating physician if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Martinez*, 64 F.3d at 176; (citing 20 C.F.R. § 404.1527(d)(2)). However, " '[t]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 175 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). The relevant criteria to consider provides that the ALJ consider (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *See* 20 C.F. R § 404.1527. "Good cause for abandoning the treating physician rule includes 'disregarding statements

[by the treating physician] that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by evidence'." *Legett,* 67 F.3d at 566; citing *Greenspan,* 38 F.3d at 237.

Where there is reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, the ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under 20 CFR 404.1527 (2); *See Newton v. Apel*, 209 F.3rd 448 (5th Cir. 2000). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

Finally, the Court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnosis and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history." *Hendricks v. Apfel*, No. 99-1212, 2000 WL 174884, at *3 (E.D. La. Feb. 14, 2000) (*citing Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995)).

The concept of disability is defined in the Social Security Act as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted . . . for a constructive period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). Section 423(d)(3) of the Act further defines "physical or mental impairment" as "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *See* 42 U.S.C. § 423(d)(3).

### III.   Analysis

Claiborne alleged disability due to hypertension, back pain, and anxiety in her initial

application.[38] In her request for review of the ALJ's decision, Claiborne stated she had requested a review because she now has diabetes.[39] Claiborne states that her need for finances is urgent as she does not have the money to pay for costs of basic necessities such as electricity, water, rent, and education for 16-year-old twins and a seven-year-old.[40]

In opposition, the Commissioner contends that the ALJ's decision in analyzing Claiborne's claim for DIB and SSI benefits should be affirmed because: (1) substantial evidence supports the ALJ's decision that Claiborne's hypertension back pain, anxiety and diabetes singularly and in combination do not render her unable to engage in a substantial gainful activity and (2) the ALJ applied the correct legal standard.[41]

The ALJ noted that while Claiborne was diagnosed with hypertension, that the impairment does not preclude all work activity. The record shows that Claiborne had reported a history of hypertension which fluctuated substantially between 2004 till 2010 due to her inconsistent adherence to her medication regime.[42]

The record reveals that in February 2004, Dr. Albrecht measured Claiborne's blood pressure ("BP") at 125/80, and in November 2005 it was 130/80.[43] In January 2006, Claiborne's, BP was measured at 150/106, and both the record and the ALJ's report show that in August 2006

---

[38]Rec. Doc. No. 11-6, Tr. 139.

[39]Rec. Doc. No. 11-2, p. 15.

[40]Rec. Doc. No. 12, p. 1.

[41]Rec. Doc. No. 16, p. 1.

[42]Rec. Doc. No. 11-7, Tr. 199-240.

[43]Rec. Doc. No. 11-7, Tr. 199-240; Classification for Blood Pressures: <120 and <80 is Normal, 120-139 or 80-89 is Prehypertension, 140-159 or 90-99 is Stage I Hypertension, 160< or 100< is Stage II Hypertension. First number is top number (systolic) and Second number is bottom number (dialostic).
*Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982*

Claiborne's BP measured 200/120, which is classified as stage II hypertension.[44]

The records show that in January 2007, Dr. Albrecht increased Claiborne's prescription for Clonidine and in August 2007 her blood pressure returned to normal levels of 120/80.[45] In July 2009, her BP was 130/80.[46] Her blood pressure remained normal for the majority of the time until October 2009, except when she had not taken her blood pressure medication.[47]

In October 2009, her blood pressure was 140/80 and the Family Medical Center noted she was not on her medication.[48] In November 2009, the River Parishes Hospital measured Claiborne's BP at 114/76 and 150/68 and the Family Medical Center measured it as 140/90.[49] On February 8, 2010, the Family Medical Center found her BP to be 190/110 but on February 10, 2010, her BP was 129/76.[50] Claiborne's hypertension did not singularly meet the medically determined impairment.

In addition to hypertension, the ALJ noted that Claiborne was obese[51] and weighed 246 lbs, a medically determinable impairment.[52] However, Social Security Ruling 02–01 p does not mandate a particular mode of analysis of obesity, but it states only that obesity, in combination with other

---

[44]Rec. Doc. No. 11-7, Tr. 199-240; *See also* Rec. Doc. No. 11-2, Tr. 24-25

[45]*Id.*

[46]*Id.*

[47]*Id.*

[48]*Id.*

[49]*Id.*

[50]*Id*.

[51]Obesity is an condition that is often associated with disturbances of the musculoskeletal system, respiratory system, and cardiovascular system." Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity." See 20 C.F.R. pt. 404, subpt. P, app. 1.

[52]*See* Rec. Doc. No. 11-2, Tr. 24. *See* S.S.R. 02-01 p, Introduction, 2000 WL 628049, at *1 (S.S.A.).

impairments, "may" increase the severity of the other limitations. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411–12 (6th Cir.2006 ) ("It is a mischaracterization to suggest that Social Security Ruling 02–01 p offers any particular procedural mode of analysis for obese disability claimants."). This ruling also does not require an ALJ to specifically reference this ruling in his analysis.

The ALJ considered the combination of her impairments which included hypertension and obesity, and found that while there was a recommendation that Claiborne lose weight, there was no evidence that either of these medical limitations resulted in function limitations affecting her ability to work. As such, the Court finds that the ALJ's opinion that the combination of hypertension and obesity did not meet the listing level requirement is supported by substantial evidence.

The record shows that she weighed 246 pounds in August 2006, with a BMI of 40.[53] Claiborne provided evidence that she was being treated with prescription medication for her obesity with Adipex since May 2007 and was instructed to lose weight through diet and exercise.[54] Claiborne's weight fluctuated.[55] However, the combination of her hypertension and weight, which may have been a bit more difficult to regulate due to her weight, did not prevent her from working through 2009.

The ALJ also found that while Claiborne experienced back pain that there were no positive physical findings.[56] The ALJ further held that there were no noted findings that supported the

---

[53]A BMI of 40 or more is considered Extreme Obesity (Class III). Phentermine is a weight-loss medication approved for short-term use (three months) in adults. Using weight-loss medications short term does not usually lead to long-term weight loss.
*Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/obesity/basics/symptoms/con-20014834*

[54]*See* Rec. Doc. No. 11-7, Tr. 238.

[55]*See* Rec. Doc. No. 11-7, Tr. 227.

[56]*See* Rec. Doc. No. 11-2, Tr. 25.

allegations of back pain. However, the record reveals that Dr. Albrecht diagnosed Claiborne with

low back pain in August 2006.[57] In March 2010, Dr. Albert Hendler, ("Dr. Hendler"), performed

an x-ray of Claiborne's lumbosacral with interpretation, electrocardiogram with interpretation, and

a comprehensive physical exam with history on Claiborne.[58] The x-ray showed findings of mild to

moderate lumbar scoliosis,[59] minimal spurring of the body of L4,[60] and that the x-ray of the

sacroiliac joint was underexposed.[61]

Contrary to the finding of no explanation for her complaint of low back pain, the presence

of lumbar scoliosis could be an explanation for mild pain. However, Dr. Mandich noted that

Claiborne could walk without difficulty. Dr. Mandich also noted that the rest of Claiborne's physical

exam was normal including the spine and back, and her gait, station, and the range of motion in her

neck and back were normal.[62] Dr. Mandich noted that Claiborne could also walk on her heels and

toes, squat and rise without support. Further, her straight leg test was negative bilaterally.[63] She

---

[57]*See* Rec. Doc. No. 11-2, Tr. 25.

[58]*See* Rec. Doc. No. 11-7, Tr. 241.

[59]*Id.* at 242. Scoliosis is a lateral (toward the side) curvature in the normally straight vertical line of the spine and in most cases develops in children ages nine to fourteen. Scoliosis can cause mild pain and imbalance of the muscles. Scoliosis is usually mild and needs no treatment. If the deformity in the chest region is very severe and goes untreated, persistent back pain may develop.
*Patient.co.uk*, *http://www.patient.co.uk/health/Scoliosis-%28Curvature-of-the-Spine%29.htm*

[60]The fourth lumbar spine vertebra (L4) is located towards the bottom of the lumbar section, near the sacral vertebrae at the bottom of the spine.
*Health Line, http://www.healthline.com/human-body-maps/l4-fourth-lumbar-spine-vertebrae*. Bone spurs are bony projections that develop along the edges of bones. These bone spurs can pinch the spinal cord or its nerve roots and may sometimes cause weakness or numbness in the arms or legs, and pain and loss of motion in the joints. *Mayo Clinic*, *http://www.mayoclinic.org/diseases-conditions/bone-spurs/basics/symptoms/con-20024478*

[61]The sacroiliac joints link the pelvis and lower spine, supporting the weight of the upper body when standing.
*Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/sacroiliitis/multimedia/sacroiliac-joints/img-20005962*

[62]Rec. Doc. No. 11-7, Tr. 250.

[63]Rec. Doc. No. 11-7, Tr. 248.

noted that despite her condition, she performed work activity. Further the records do not show that any medication was prescribed to treat or complaints of back pain.[64]

While the ALJ's finding that there was no medical explanation for her low back pain was inaccurate, it does not alter the finding that her back condition was not a severe impairment. The physical examination did not produce any results consistent with severe back pain. Consequently, the ALJ's finding that Claiborne's low back pain was not disabling is based upon substantial evidence.

The ALJ further found that while Claiborne suffered with depression, the depression caused no more than minimal limitation in her ability to perform basic mental work activities such as activities of daily living, social functioning, concentration, persistence and pace.[65] The ALJ further held that there were no episodes of decompensation.

Anxiety is a disorder listed in the mental listing level impairment. It is found to exist where there is pursuant to § 12.06(A) : generalized persistent anxiety accompanied by three or more of the following motor tension, autonomic hyperactivity, apprehensive expectation, vigilance and scanning or persistent irrational fear, recurrent severe panic attacks, recurrent obsessions and compulsions, and recurrent recollections of a traumatic event.[66]

The required level of severity for these disorders is met when the requirements in both A and B or A and C are satisfied. Section (B) requires that there be two of the following: marked restriction of activities of daily living, maintaining social functioning or maintaining concentration, persistence,

---

[64]Rec. Doc. No. 11-17, Tr. 5-19.

[65]*See* Rec. Doc. No. 11-2, Tr. 23.

[66]*See* 20 C.F.R. pt. 404, subpt. P., app. 1, §12.06.

or pace, or repeated episodes of decompensation, each of extended duration.[67] Section (C) is met when the anxiety results in complete inability to function independently outside the area of one's home.[68]

The record shows that as early as September 6, 2006, Claiborne was prescribed Buspar, an anxiolytic psychotropic drug.[69] On July 25, 2011, after the ALJ rendered his opinion, Claiborne went to River Parishes Mental Health Center where she complained of decreased sleep, losing her job in May 2011, crying spells and depression.[70] She was diagnosed with depressive disorder not otherwise specified. It was further noted that she had occupational and/or economical problems in addition to legal problems. After filing her request for review in this court, Claiborne sought to supplement the record on July 23, 2013, with a letter dated July 16, 2013, from the South Central Louisiana Human Services Authority verifying that she suffered with major depression, recurrent. It indicated that she was prescribed Lexapro[71] 20 mg daily and Hydroxyzine[72] 50 mg 1-2 at

---

[67]*Id.*

[68]*Id.*

[69]*See* Rec. Doc. No. 11-7, Tr. 201. Buspirone (sold under the brand name Buspar) is used to treat certain anxiety disorders or to relieve the symptoms of anxiety. However, buspirone usually is not used for anxiety or tension caused by the stress of everyday life.
*Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/buspirone-oral-route/description/drg-20062457*

[70]Rec. Doc. No. 11-7, Tr. 280. The claimant's testimony conflicts regarding when her employment was terminated.

[71]Lexapro (escitalopram) is an antidepressant belonging to a group of drugs called selective serotonin reuptake inhibitors (SSRIs). Escitalopram affects chemicals in the brain that may become unbalanced and cause depression or anxiety. Lexapro is used to treat anxiety in adults. Lexapro is also used to treat major depressive disorder in adults and adolescents who are at least 12 years old. http://www.drugs.com/lexapro.html

[72]Hydroxyzine is used as a sedative to treat anxiety and tension. It is also used together with other medications given for anesthesia. Hydroxyzine may also be used to control nausea and vomiting. *http://www.drugs.com/hydroxyzine.html*

bedtime.[73]

While there is evidence that Claiborne was prescribed psychotropic medication, there is no indication in the record that Claiborne experienced any decompensation as required by 12.06(B). According to the record, Dr. Ducote completed a psychiatric review technique indicating that her mental impairment of anxiety related disorder was not severe. Dr. Ducote concluded that Claiborne had no episodes of decompensation of an extended period.[74] The ALJ's finding that Claiborne's depression and anxiety disorders were not severe is based upon substantial evidence.

The Court notes that despite Claiborne's ailments, she was able to and did work through May 2011 when she was terminated. However, her alleged ailments neither singularly nor in combination were severe enough to prevent her from engaging in any major life activity. Therefore, considering the totality of the evidence, the court finds that the ALJ's findings that Claiborne's ailments either singly or in combination were not disabling is supported by substantial evidence.

## IV.    Recommendation

**IT IS RECOMMENDED** that the decision of the Administrative Law Judge denying Annette, M. Claiborne's Disability Insurance Benefits and Supplemental Social Security Income benefits be **AFFIRMED**.

**IT IS FURTHER RECOMMENDED** that Claiborne's **Motion for Ruling (R. Doc. 20)** be **DENIED AS MOOT**.

**IT IS FURTHER RECOMMENDED** that Claiborne's **Motion to Supplement Complaint (R. Doc. 22)** be **DENIED**.

_____

[73]Rec. Doc. No. 14-1. Page 1 of 9, 07/23/13.

[74]Rec. Doc. No. 11-7. Tr. 270.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[75]

New Orleans, Louisiana, this 27th day of August, 2014

KAREN WELLS ROBY
**UNITED STATES MAGISTRATE JUDGE**

---

[75]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.